**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff - Appellant*,

v.

RYAN R. VANDYKE,

*Defendant - Appellee.*

No. 24-2861

D.C. No.
4:23-cr-00193-
BLW-1

OPINION

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, District Judge, Presiding

Argued and Submitted July 9, 2025
Seattle, Washington

Filed October 27, 2025

Before: M. Margaret McKeown, Richard A. Paez, and
Gabriel P. Sanchez, Circuit Judges.

Opinion by Judge McKeown

# SUMMARY[*]

## Criminal Law

On the government's appeal, the panel reversed the district court's order dismissing an indictment charging Ryan VanDyke with illegal firearm possession in violation of 18 U.S.C. § 922(g)(8)(C)(ii), and remanded for further proceedings.

Section 922(g)(8)(C)(ii) prohibits firearm possession by an individual subject to a court order that "by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against [an] intimate partner or child that would reasonably be expected to cause bodily injury."

VanDyke did not dispute that he was subject to a no-contact order that not only reiterated that he could not contact his victim but also mandated that he not use, attempt to use, or threaten physical force against her. By the time that order was issued, he had been dogging his victim for months, flouting both the conditions of his probation for a separate telephone-harassment offense and the terms of the earlier court-ordered protections obtained by his victim for herself and her minor child. Nor did VanDyke contest that by carrying his gun at the courthouse he violated Section 922(g)(8)(C)(ii).

Instead, VanDyke argued that the application of that federal statute to him violated the Second Amendment. The district court agreed that Section (C)(ii), as applied to

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

VanDyke, does not fall within a historical tradition of firearm regulation.

The panel reversed in light of intervening precedent in *United States v. Rahimi*, 602 U.S. 680 (2024). As the Court wrote in *Rahimi*, "[s]ince the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms." The Court emphasized that a historical analogue suffices; a "historical twin" is not required. There is also a long historical tradition concerning "categories of persons thought by a legislature to present a special danger of misuse." Such categories include criminals facing serious pending charges on pretrial release. VanDyke fits this description. Section 922(g)(8)(C)(ii) is therefore constitutional as applied to VanDyke.

**COUNSEL**

Scott A.C. Meisler (argued) and Mahogane D. Reed, Trial Attorneys, Appellate Section; Antoinette T. Bacon, Supervisory Official; Criminal Division; Lisa H. Miller, Deputy Assistant Attorney General; Nicole M. Argentieri, Principal Deputy Assistant Attorney General; United States Department of Justice, Washington, D.C.; Katherine L. Horwitz, Assistant United States Attorney, Office of the United States Attorney, United States Department of Justice, Boise, Idaho; Jack Haycock, Assistant United States Attorney, Frank Zebari, Appellate Coordinator; Justin D. Whatcott, Acting United States Attorney; Joshua D. Hurwit, United States Attorney; Office of the United States Attorney, United States Department of Justice, Pocatello, Idaho; for Plaintiff-Appellant.

Samuel Macomber (argued), Assistant Federal Defender, Federal Defender Services of Idaho, Boise, Idaho, for Defendant-Appellee.

# OPINION

McKEOWN, Circuit Judge:

In May 2023, Ryan VanDyke walked into an Idaho state courthouse carrying a fully loaded Smith & Wesson .38 revolver. At the time, he was subject to a civil protection order and a no-contact order and faced a felony stalking charge—all because he had persistently ignored court orders to stay away from a woman who wanted to escape his prolonged harassment. He was subsequently indicted for illegal firearm possession in violation of 18 U.S.C. § 922(g)(8)(C)(ii), which prohibits firearm possession by an individual subject to a court order that "by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against [an] intimate partner or child that would reasonably be expected to cause bodily injury."

VanDyke does not dispute that he was subject to a no-contact order that not only reiterated that he could not contact his victim but also mandated that he not use, attempt to use, or threaten physical force against her. By the time that order was issued, he had been dogging his victim for months, flouting both the conditions of his probation for a separate telephone-harassment offense and the terms of the earlier court-ordered protections obtained by his victim for herself and her minor child. Nor does VanDyke contest that by carrying his gun at the courthouse in March 2023 he violated Section 922(g)(8)(C)(ii), which prohibits firearm possession by individuals subject to no-contact orders like that against VanDyke.

Instead, VanDyke argues that the application of that federal statute to him violated the Second Amendment. The district court agreed that Section (C)(ii), as applied to

VanDyke, does not fall within a historical tradition of firearm regulation. In light of intervening precedent in *United States v. Rahimi*, 602 U.S. 680 (2024), we reverse. As the Court wrote in *Rahimi*, "[s]ince the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms." *Id*. at 690. The Court emphasized that a historical analogue suffices; a "historical twin" is not required. *Id.* at 692 (quoting *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 30 (2022)). We also have a long historical tradition concerning "categories of persons thought by a legislature to present a special danger of misuse." *Id.* at 698; *see also United States v. Duarte*, 137 F.4th 743, 756–61 (9th Cir. 2025) (en banc). Such categories include criminals facing serious pending charges on pretrial release. *See United States v. Perez-Garcia*, 96 F.4th 1166, 1182–84 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 2707 (2025). VanDyke fits this description to a tee. We conclude that Section 922(g)(8)(C)(ii) is constitutional as applied to VanDyke.

## Background

VanDyke was placed under a civil protection order in April 2022, forbidding him from contacting, stalking, or using physical force against his victim or her minor children. The order specifically applied to "Stalking and/or Threats," with a citation to an Idaho statute enabling victims of stalking and harassment to petition for protection orders and criminalizing violations of those orders. Two months later, VanDyke was convicted of using a telephone to annoy, harass, intimidate or threaten someone, and he was placed on two years of probation. *See* Idaho Code §§ 18-6710–11.

In October 2022, VanDyke was charged with stalking—
that is, engaging in "a course of conduct that seriously
alarms, annoys or harasses the victim." Idaho Code § 18-
7906. Specifically, the state alleged that VanDyke had texted
and left packages for his victim. He had allegedly followed
her and "put an app on her phone." He had also emailed her
family and sent items to them, asking them to relay the
messages and "gifts" to his victim. VanDyke was charged
with stalking in the first degree, a felony, indicating the
presence of aggravating circumstances. Idaho Code § 18-
7905. The prosecutors alleged that VanDyke's stalking
conduct violated the April civil protection order. His conduct
also violated the conditions of his probation for the
telephone-harassment charge.[1]

After an initial hearing regarding the felony stalking
charge, VanDyke was placed under a new no-contact order.
That no-contact order was issued under Idaho Code Section
18-920, which permits a state court to forbid contact with
another person where the defendant is charged with or
convicted of various crimes against the person, including,
among others, assault and battery (Idaho Code §§ 18-901,
903, 905, 907, 909, 911, 915); domestic violence (§ 18-918);
use of telecommunication to annoy, terrify, threaten,
intimate, harass, or offend (§§ 18-6710–11); and stalking
(§§ 18-7905–06).

---

[1] We consider the background facts related to VanDyke's criminal
charges in this as-applied challenge for the limited purpose of evaluating
whether his no-contact order under Idaho state law and resulting firearm
restriction is "relevantly similar" to historical traditions of regulation of
Second Amendment rights. *Bruen*, 597 U.S. at 28–29. We do not engage
in collateral review of the validity of any state court orders. *See United
States v. Young*, 458 F.3d 998, 1005 (9th Cir. 2006).

The October 2022 order prohibited VanDyke from, among other things, "us[ing], attempt[ing] to use or threaten[ing] use of physical force, [or] engag[ing] in any other conduct that would place the protected person(s) in reasonable fear of bodily injury." The no-contact order also stated: "As a result of this Order, it may be unlawful for you to purchase or possess a firearm, including a rifle, pistol, or revolver, or ammunition pursuant to federal law under 18 U.S.C. § 922(g)(8)." At his hearing, the state magistrate judge advised VanDyke that he was "to have no firearms in his possession including his residence, vehicles, sheds, or storage units." The order was to remain in place for two years or until dismissal of the case against VanDyke.

In March 2023, the court renewed the April 2022 civil protection order, forbidding VanDyke from contacting his victim, her minor child, or other family members of the victim for another year.

In sum, by May 2023, VanDyke was subject to a renewed civil protection order issued pursuant to a domestic violence crime prevention statute, facing felony stalking charges, and under a no-contact order specifically forbidding the use or threat of force—all related to the same victim. That month, VanDyke entered a state courthouse for a pretrial conference regarding his felony stalking case. He was carrying a loaded revolver in his backpack.

VanDyke was then indicted for possession of a firearm while subject to the October no-contact order, in violation of 18 U.S.C. § 922(g)(8)(C)(ii) ("Section (C)(ii)"). It is undisputed that the October no-contact order against VanDyke satisfied the notice-and-hearing requirements of Section 922(g)(8)(A), the restraint-from-stalking language in Section 922(g)(8)(B), and the prohibition on the "use,

attempted use, or threatened use of physical force against [an] intimate partner or child that would reasonably be expected to cause bodily injury" in Section 922(g)(8)(C)(ii).

VanDyke successfully moved to dismiss the indictment, arguing that Section (C)(ii) is unconstitutional as applied to him. At the time of its decision, the district court did not have the benefit of *Rahimi*. On appeal by the government, we reverse the district court's order dismissing the indictment and remand for further proceedings.

## Analysis

Following the Supreme Court's decision in *Bruen* in 2022, our analysis in Second Amendment cases has changed dramatically. 597 U.S. 1. The first step in analyzing a Second Amendment challenge is to "consider whether the Second Amendment's plain text covers an individual's proposed course of conduct." *Perez-Garcia*, 96 F.4th at 1178. If the plain text covers that conduct, then it is presumptively protected by the Second Amendment. *Bruen*, 597 U.S. at 24. Neither party disputes that the Second Amendment applies here.

The crux of this case is at the second step. A few months after the district court's decision in April 2024, the Supreme Court decided *Rahimi*, which clarified the appropriate scope of the required inquiry. 602 U.S. 680. The key question is whether the modern firearm regulation is "consistent with the principles that underpin our regulatory tradition" and "underl[ie] the Second Amendment." *Id.* at 692. In that determination, *why* a regulation burdens Second Amendment rights and *how* it does so are "central" considerations. *Id.* For a regulation to pass constitutional muster, its "why" and "how" must have "a well-established and representative historical analogue." *Bruen*, 597 U.S. at

30 (emphasis omitted). The Court in *Rahimi* reiterated that a challenged regulation need not "precisely match its historical precursors" or be a "historical twin," and elements of multiple historical laws may be considered together to define a tradition of regulation. 602 U.S. at 692, 698 (internal quotation marks omitted).

The Court in *Rahimi* held that its analysis "starts and stops with Section 922(g)(8)(C)(i) because the Government offers ample evidence that the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others." *Id*. at 693. Because of this posture, the Court did not need to decide whether regulation under Section (C)(ii), Section (C)(i)'s closest neighboring provision, is also permissible. However, much of the Court's discussion is framed with respect to Section 922(g)(8) as a whole and, like our sister circuits, we are convinced that the decision provides the analytical framework applicable to Section (C)(ii) as well as Section (C)(i). *See, e.g.*, *United States v. Perez-Gallan*, 125 F.4th 204, 214–16 (5th Cir. 2024) (relying on *Rahimi* to reject a challenge to Section (C)(ii)); *United States v. Gordon*, 137 F.4th 1153, 1156–57 (10th Cir. 2025) (same). We see no reason to deviate from this framework in addressing an as-applied challenge.

Section (C)(ii)'s "why" and "how" are analogous to two historical traditions of firearm regulation. The first tradition is individual disarmament based on a judicial determination of dangerousness, as embodied by the surety and going-armed laws relied upon in *Rahimi*. 602 U.S. at 695–700. The second tradition is categorical disarmament, as manifested in laws forbidding firearm possession by whole groups of people whom "the *legislature* deemed dangerous." *Duarte*, 137 F.4th at 759 (emphasis added).

## I.  Individual Disarmament

The Supreme Court's decision in *Rahimi* focused on the tradition of individual disarmament that involved judicial determinations of dangerousness, exemplified in the surety and going-armed laws of the eighteenth and nineteenth centuries. 602 U.S. at 694–98. In the historical-analogy analysis, the Court focused on the burden imposed, as well as the procedures of and reasons for imposition.

To begin, the burden imposed by all subsections of 18 U.S.C. § 922(g) is "temporary disarmament." *Rahimi*, 602 U.S. at 699; *see also Gordon*, 137 F.4th at 1156 (noting the identical burdens imposed by Sections (C)(i) and (C)(ii)). The firearm prohibitions of Sections (C)(i) and (C)(ii) cover only the period during which the defendant is subject to a restraining order. *Rahimi*, 602 U.S. at 699. The Supreme Court has already concluded that such a restriction is well within the national tradition of firearms regulation. *Id.*

The terms of 18 U.S.C. § 922(g)(8) ensure that temporary disarmament pursuant to Section (C)(ii), as with Section (C)(i), is imposed only after notice and an opportunity to be heard. § 922(g)(8)(A). VanDyke does not contest that he was given notice and a hearing, at which he was represented by counsel, regarding the October 2022 no-contact order. These procedures find historical analogy in the surety laws, which involved judicial evidence-taking, summons, and an opportunity to respond. *See Rahimi*, 602 U.S. at 696–97.

We are thus left to decide whether there exists a historical analogy to the justifications for VanDyke's temporary disarmament. Facially and in context, Section (C)(ii) and Section (C)(i) share a common aim: the protection of victims of intimate partner violence from the

harassers and abusers who pose a threat to their physical safety. *Cf. United States v. Chapman*, 666 F.3d 220, 228 (4th Cir. 2012). Sections (C)(i) and (C)(ii) were, after all, passed together in the Violent Crime Control and Law Enforcement Act of 1994, 108 Stat. 1796, 2014 (1994), and appeared together within a subtitle on domestic violence. The Ninth Circuit has noted a similar "historical justification[]" for disarmament like VanDyke's: "protecting the public from future criminal acts of the accused defendant." *Perez-Garcia*, 96 F.4th at 1184. That basic motivation is analogous to the motivation of the surety laws (prevention of violence, including spousal abuse) and of the going-armed laws (prevention of terror and "disrupt[ion of] the public order"). *Rahimi*, 602 U.S. at 695, 697 (internal quotation marks omitted). The comparability between (C)(i) and (C)(ii)'s justifications has informed other circuits' application of *Rahimi* in upholding of Section (C)(ii) against facial challenges. *See Gordon*, 137 F.4th at 1156; *Perez-Gallan*, 125 F.4th at 213–15.

The further question in this as-applied challenge is whether the statute's application to VanDyke was supported by similar justifications. All evidence suggests that it was.

Under Idaho law, a no-contact order "must be made to protect the current or future victims" of crimes enumerated in Section 18-920 of the Idaho Criminal Code, which include felony stalking, telephone harassment, as well as assault, battery, and other crimes against persons. *State v. Lodge*, 461 P.3d 819, 822 (Idaho 2020). VanDyke does not argue that the state court failed to comply with this requirement. As other circuits have done, we conclude that state-law prerequisites like Idaho's enable the inference of a judicial determination of dangerousness. *See United States v. Boyd*, 999 F.3d 171, 187 (3d Cir. 2021), *cert. denied*, 142 S. Ct.

511; *Perez-Gallan*, 125 F.4th at 215; *Gordon*, 137 F.4th at 1157–58. It is common sense that "the primary purpose of a no-contact order is to protect the victims of domestic abuse by the offender." *Sunuwar v. Att'y Gen.*, 989 F.3d 239, 248 (3d Cir. 2021) (internal quotation marks omitted).

By the time the October 2022 no-contact order was issued, VanDyke had already been under a civil protection order prohibiting any contact, harassment, or stalking of the victim. In contravention of that earlier court order and the conditions of his probation, VanDyke was charged with stalking in the first degree for "knowingly and maliciously engag[ing] in a course of conduct that seriously alarmed, annoyed or harassed" the same woman. The state alleged that VanDyke texted her, followed her, put an app on her phone, sent "gifts" to her family members, and left packages on her car. Given the terms of the October 2022 order, the state court found it "appropriate" to enjoin VanDyke from "us[ing], attempt[ing] to use or threaten[ing] use of physical force" against his victim or "engag[ing] in any other conduct that would place [her] in reasonable fear of bodily injury." Considering similar terms, the Third Circuit reasoned:

> If the state court believed that [the defendant] posed only a risk of harassment untethered from dangerousness, it could have issued no order at all, it could have issued only a 'no contact' order, or it could . . . strike out the physical injury component and leave in only the directive with respect to harassment. It instead issued the type of order we would

> expect when faced with a person who posed
> a credible danger to his [victims].

*Boyd*, 999 F.3d at 187. The same is true here. We agree that it is reasonable to infer from the terms of this order a prospective concern for the protected persons' physical safety.[2] This was not a simple order prohibiting contact; instead, the order specifically enjoined the use or threat of physical force after VanDyke had violated previous court orders.

Under these circumstances—a state statutory scheme authorizing courts to issue no-contact orders to protect victims of domestic abuse from harm; an order prohibiting the use of force against that victim, satisfying a federal statute designed to prevent domestic violence; and a defendant who, in contravention of court orders, allegedly harassed and stalked his victim for months—the obvious justification for restricting VanDyke's firearm possession was to mitigate the risk he posed to his victim's physical safety.

We conclude that the justification for the entry of the no-contact order against VanDyke—and thus this application of Section 922(g)(8)(C)(ii)—was the state court's implicit

---

[2] Contrary to VanDyke's arguments, Ninth Circuit precedent permits reliance on the terms of an order satisfying Section (C)(ii) to infer a threat determination. *See United States v. Sanchez*, 639 F.3d 1201, 1206 (9th Cir. 2011) (holding that *absent* the language required by Section 922(g)(8), "there is no presumption that the person subject to the order represents a threat of violence," and distinguishing orders that "contain explicit terms substantially similar in meaning to the language of (8)(C)(ii)").

determination that he posed a threat to the physical safety of his victim and other protected persons. This is not just analogous, but virtually identical, to the justification that the Court upheld in *Rahimi*. Like our sister circuits, given such a strongly implied dangerousness finding by the state court, we see no need to require further documentation. *See Boyd*, 999 F.3d at 187; *Gordon*, 137 F.4th at 1157. VanDyke's argument ignores the terms of Section (C)(ii) and the structure of Idaho law. *Cf. United States v. Reese*, 627 F.3d 792, 802–04 (10th Cir. 2010), *abrogated on other grounds by Bruen*, 597 U.S. 1 (concluding, for similar reasons, that "no [explicit credible-threat] findings were necessary" to establish that Section (C)(ii) was intended to keep firearms out of the hands of those who pose a heightened danger of misuse towards an intimate partner or child).

## II.    Categorical Disarmament

In addition to the tradition of individualized disarmament, America's history of firearm regulation also includes "longstanding prohibitions" on firearm possession by certain categories of people. *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). Categorical disarmament is based on legislatively presumed danger, rather than an individualized assessment of risk. *Duarte*, 137 F.4th at 759 ("The historical record reveals a host of regulations that disarmed those whom the legislature deemed dangerous on a categorical basis.").

VanDyke falls within at least one category of people who were historically disarmed on a categorical basis: criminal defendants facing serious charges pending trial, including those eligible for pretrial release. *See Perez-Garcia*, 96 F.4th at 1184. VanDyke's criminal charge was undoubtedly

serious: felony stalking in the first degree, aggravated by his repeated disobedience of court orders.

There exists a tradition of restrictions on firearm possessions for groups that were deemed dangerous by legislatures, in the absence of criminal charges. These groups included intoxicated persons and "certain vagrants" whom the legislature thought, "as a class, presented a danger to the community if armed." *Duarte*, 137 F.4th at 760. The right to bear arms was limited for many groups deemed, for various reasons, to be outside the bounds of "peaceable or virtuous citizens." *United States v. Bena*, 664 F.3d 1180, 1184 (8th Cir. 2011). Detention and disarmament were within the power of the legislature even when the group in question was not defined by past violence. *Perez-Garcia*, 96 F.4th at 1183–84 (noting that such penalties were imposed for non-violent offenses including forgery, horse theft, and "running away with a ship or vessel") (citation omitted).

The reality of the dangerous intersection of firearms and domestic abuse is well-documented. As the Supreme Court has recognized, "[f]irearms and domestic strife are a potentially deadly combination nationwide." *United States v. Hayes*, 555 U.S. 415, 427 (2009). "The dangerous propensities of persons with a history of domestic abuse are no secret, and the possibility of tragic encounters has been too often realized." *United States v. Kafka*, 222 F.3d 1129, 1132 (9th Cir. 2000) (quoting *United States v. Meade*, 175 F.3d 215, 226 (1st Cir. 1999)). Congress enacted the gun-possession restrictions of Section 922(g)(8)(C)(i) and (C)(ii) "in light of evidence that domestic violence presents a pervasive problem in American society." *Bena*, 664 F.3d at 1184. Further illustrative of this categorical concern is the fact that dozens of state legislatures restrict, or permit state courts to restrict, gun possession by people subject to

protective orders. Brief for the United States 34–35 nn.22–23, *United States v. Rahimi*, 602 U.S. 680 (2024) (collecting statutes). At least one circuit has already concluded that individuals "subject to domestic violence protective orders covered by § 922(g)(8) fall within the historical bar of presumptively dangerous persons." *See Boyd*, 999 F.3d at 186. Because VanDyke's disarmament falls squarely within the first categorical-disarmament tradition, related to facing serious charges pending trial, we need not answer whether it also falls into the bar against presumptively dangerous persons not facing such charges.

Section 922(g)(8)(C)(ii) is constitutional as applied to VanDyke under the historical traditions of individual disarmament and categorical disarmament. We reverse the district court's dismissal of the indictment.

**REVERSED and REMANDED.**